[No. C034423. Third Dist. Sept. 5, 2001.]

ROBERT LOVEJOY, Plaintiff and Appellant, v.
AT&T CORPORATION, Defendant and Appellant.

### COUNSEL

Law Offices of Mark C. Barulich and Mark C. Barulich for Plaintiff and Appellant.

Watson, Khachadourian Re & Iams and Kevin R. Iams for Defendant and Appellant.

### OPINION

**CALLAHAN, J.**—One of the fastest growing subjects of consumer complaints is the practice of "slamming," wherein one telephone carrier company surreptitiously gains control over the service provided by another

without notice to the customer.[1] Slamming is prohibited by the law of this state. (Pub. Util. Code, § 2889.5.)[2] In this case, plaintiff Robert Lovejoy, individually and doing business as Lovejoy Drilling, filed a lawsuit claiming that defendant AT&T Corporation (ATT) "slammed" his toll-free 800 number and that he lost his business as a result.

Plaintiff appeals from a judgment in favor of ATT after the trial court granted ATT's motion for judgment on the pleadings, dismissing his complaint which alleged a single count of fraud. ATT has filed a protective cross-appeal, urging that, even if the judgment on the pleadings was erroneously granted, it should have gotten out of the case earlier on a motion for summary judgment.

We will conclude that the trial court erred in granting the motion for judgment on the pleadings, and that the order denying ATT's motion for summary judgment was correct. We will reverse and remand with directions.

### PROCEDURAL BACKGROUND

Plaintiff originally filed a complaint alleging that Pacific Bell (Pac Bell) and several Doe defendants tortiously allowed his toll-free 800 business telephone service to be terminated without his knowledge. The complaint was later amended to name ATT as a Doe defendant. Plaintiff was granted leave of court to file a two-count amended complaint for negligence and fraud against ATT only, alleging that ATT caused the switching and then cancellation of his 800 telephone service without his consent.

ATT brought a motion for summary judgment, primarily on the ground that plaintiff's action was barred by the "filed rate doctrine," which will be explained in detail, *infra*. The court ruled that the negligence count was barred by the filed rate doctrine, but denied ATT's motion as to the fraud cause of action.

Plaintiff proceeded to trial under a first amended complaint, alleging a single cause of action for fraud. In chambers, ATT brought a number of

---

[1]See "FCC expected to strengthen 'slamming' restrictions" <http://cjonline.com/stories/121798/bus_slamming.shtml> [as of Aug. 28, 2001]. We have been unable to find a dictionary definition of the term "slamming" in the telecommunications context, as the term is relatively new. However, it is generally recognized as "the illegal practice of changing a consumer's telephone service without permission." (Federal Communications Commission Consumer Facts, "When Your Telephone Service Is Switched Without Your Permission— 'Slamming' " <http://www.fcc.gov/cib/consumerfacts/slamming.html> [as of Aug. 28, 2001].)

[2]A carrier engaging in slamming is subject to statutorily prescribed sanctions under section 2889.5 of the Public Utilities Code. However, those sanctions are "in addition to any other remedies available by law." (Pub. Util. Code, § 2889.5, subd. (g).)

motions, including one for judgment on the pleadings, which the court granted. Since this action was effectively terminated by the granting of the motion, we summarize the allegations of the pleading in some detail.

### The First Amended Complaint

At all times pertinent, plaintiff operated a business known as Lovejoy Drilling, while ATT and Pac Bell were both in the business of providing 800 telephone numbers. In September 1994, plaintiff contracted with Pac Bell to provide his business with an 800 number, which was good for the entire state.

On February 20, 1996 (all further calendar references are to that year) ATT informed Pac Bell, which was acting as plaintiff's agent, that ATT had written authorization from plaintiff to be the provider of his 800 number. Pac Bell, however, refused to release the number without proof of written authorization.

On March 1, ATT represented to a third entity, Lockheed IMS, that it had written authorization to take over plaintiff's 800 number. This representation was false—at no time did plaintiff ever authorize such a switch, either orally or in writing. ATT knew the representation was false, and made it for the sole purpose of obtaining plaintiff as a customer "for their own personal monetary gain." As a direct and proximate result of the false representation to Lockheed, Pac Bell released plaintiff's 800 number to ATT. Plaintiff had no knowledge of the switch—at all times, he continued to believe that Pac Bell was his 800 carrier. This practice is known as "slamming" in the telecommunications industry.

Prior to February 1996 plaintiff had long distance telephone service with ATT. Once ATT obtained plaintiff's 800 number it hid the charges for 800 service in its long-distance billing; the billing statement remained the same and did not indicate plaintiff was being charged for 800 service.

In August, plaintiff became embroiled in a payment dispute with ATT over his long-distance bill. As a result of the dispute, ATT disconnected plaintiff's long-distance service. The termination of service disconnected plaintiff's 800 service as well. However, plaintiff had no idea his 800 service had been terminated as a result of the payment dispute.

In March 1997, plaintiff discovered that his 800 number had been assigned to someone in Michigan, who had been getting six to 20 calls per day requesting plaintiff's services. As a proximate cause of the fraudulent conduct by ATT, plaintiff lost his business, was required to file bankruptcy, and suffered emotional distress.

## The Appeal

### I

#### *Applicable Principles—Judgment on the Pleadings*

"A motion for judgment on the pleadings is analogous to a general demurrer. [Citation.] The task of this court is to determine whether the complaint states a cause of action. All facts alleged in the complaint are deemed admitted, and we give the complaint a reasonable interpretation by reading it as a whole and all of its parts in their context. [Citations.] We are not concerned with a plaintiff's possible inability to prove the claims made in the complaint, the allegations of which are accepted as true and liberally construed with a view toward attaining substantial justice. [Citations.]" (*Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 198 [51 Cal.Rptr.2d 622].)

"Review of a judgment on the pleadings requires the appellate court to determine, de novo and as a matter of law, whether the complaint states a cause of action. [Citation.] For purposes of this review, we accept as true all material facts alleged in the complaint. [Citation.] Denial of leave to amend after granting a motion for judgment on the pleadings is reviewed for abuse of discretion. [Citation.]" (*Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1448 [37 Cal.Rptr.2d 790].)

### II

#### *The Fraud Cause of Action*

In a nutshell, plaintiff alleges that his business had 800 service with Pac Bell and long-distance service with ATT; that ATT knowingly and falsely represented to Pac Bell that plaintiff wished to switch his 800 service to ATT; that when Pac Bell refused to release the number due to the lack of a signed authorization, ATT went to another agency and made the same false representation; that as a result of this second representation, Pac Bell was induced into releasing the 800 number to ATT; that ATT thereafter billed plaintiff for 800 service but hid the 800 billing charges so that plaintiff had no idea his service had been switched; that when plaintiff got into a billing dispute with ATT over his long-distance bill, ATT pulled the plug on not only his long-distance service but (unknown to him) his 800 service as well; and that, by the time plaintiff found out his 800 number had been disconnected, he lost his business and ended up in bankruptcy.

The trial judge believed these allegations failed to state a cause of action for fraud. In its written ruling, the court gave three reasons for granting

ATT's motion: (1) plaintiff failed to plead that ATT intended to drive him out of business; since a fraud defendant is not liable for unintended consequences, proximate cause was lacking; (2) plaintiff did not, nor could he, plead that *he relied* on ATT's false representation, but instead pleaded that he was totally unaware of it; and (3) the complaint fails to state a cause of action for indirect misrepresentation because plaintiff was unable to plead that ATT either intended or had reason to believe that its misrepresentation regarding the 800 switch would be repeated to him and that he would act on it.

■ We will first analyze the complaint for the defects cited by the trial court and then separately determine whether the complaint states a cause of action, mindful that, as an appellate court, "we are not bound by the determination of the trial court, but are required to render our independent judgment on whether a cause of action has been stated." (*Hoffman v. State Farm Fire & Casualty Co.* (1993) 16 Cal.App.4th 184, 189 [19 Cal.Rptr.2d 809].)

*Failure to Plead That Defendant Intended the Type of Damage Caused to Plaintiff*

■ The trial court found the complaint insufficiently demonstrated a proximate connection between ATT's alleged fraud and the damage, explaining its reasoning as follows: " 'A complete "causal relationship" between the fraud or deceit and the plaintiff's damages is required.' [Citation.] 'The defendant must intend to induce a particular act of the plaintiff and *is not liable in fraud for unintended consequences.* [Citation.] And it must be shown that the plaintiff actually and justifiably relied upon the defendant's misrepresentation in acting to his detriment.' (*Conrad v. Bank of America* (1996) 45 Cal.App.4th 133, 157 [53 Cal.Rptr.2d 336] [(*Conrad*)].) . . . Plaintiff has pled that defendant's purpose was to obtain plaintiff as a customer for monetary gain. *Plaintiff has not pled that defendant intended plaintiff to act to his detriment. Instead, inferentially, defendant wanted to keep plaintiff as a 800 service customer for monetary gain—not to drive him out of business.*" (Italics added.)

The court's ruling implies that, in order to state a cause of action for fraud it is necessary that the defendant intend to cause the plaintiff to suffer a *particular type of damage.* That is not the law.

Section 525 of the Restatement Second of Torts (Restatement) states: "One who fraudulently makes a misrepresentation of fact . . . for the *purpose of inducing another to act or to refrain from action in reliance upon*

*it*, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." (Italics added.) Section 531 of the Restatement states the "general rule" that "[o]ne who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons *whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation*, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced." (Italics added.)

 " 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) *intent to defraud, i.e., to induce reliance*; (d) justifiable reliance; and (e) resulting damage.' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981], italics added; see also Civ. Code, § 1709; *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1108 [252 Cal.Rptr. 122, 762 P.2d 46].)

These quotations make clear that the only intent by a defendant necessary to prove a case of fraud is the intent to *induce reliance*. Moreover, liability is affixed not only where the plaintiff's reliance is *intended* by the defendant but also where it is *reasonably expected* to occur.

 The dictum in *Conrad* quoted by the trial judge in his written decision and relied upon extensively by ATT simply cannot be read for the proposition that a fraud cause of action fails unless the defrauding defendant intends the plaintiff to suffer a particular harm in reliance on the fraud.

In *Conrad*, the plaintiffs, who lost their business in bankruptcy, won a jury verdict against a bank for an alleged false promise to make them a loan based upon a bank officer's obscure reply "No problem" when the plaintiffs informed him they would be needing a loan in the future to meet expenses. The trial court granted a motion for judgment notwithstanding the verdict and we affirmed. (*Conrad, supra,* 45 Cal.App.4th at pp. 141, 145, 161.) In addition to upholding the trial court's determination that plaintiffs' claim was barred for failure to list it in their bankruptcy petition (*id.* at pp. 150-151), we detected a host of problems with regard to proof of the elements of fraud. In the unfortunate passage relied on by the trial court, we said, "The defendant must intend to induce a particular act of the plaintiff and is not liable in fraud for unintended consequences." (*Id.* at p. 157.) However, when read in conjunction with our entire discussion, it is clear that what was fatal to the plaintiff's claim was lack of proof of *intent to induce reliance* and *lack of detrimental reliance*: "We have considered the record to

identify potential candidates for detrimental reliance by plaintiffs but find none of the candidates sufficient to support a cause of action for fraud." (*Ibid.*)

Few defrauding defendants give any serious thought to the nature or quality of the harm which could befall the victims who rely on their deceptive acts. It would be unconscionable and nonsensical for such perpetrators to escape liability because of their indifference to the consequences of their opprobrious behavior. To the extent the *Conrad* dictum and the 66-year-old case it cites, *Carlson v. Murphy* (1935) 8 Cal.App.2d 607, 611 [47 P.2d 1100] can be read for the proposition that a defendant is not liable in fraud for damage that he does not anticipate, or indeed intend to occur, we reject both as inconsistent with California law.

*Other Problems with the Complaint*

Despite the foregoing flaw in the trial court's reasoning, the complaint encounters other significant obstacles if viewed as an attempt to plead a cause of action for fraud based on an affirmative misrepresentation of fact by ATT to Pac Bell.

As the trial court noted, "[r]eliance is an essential element of a fraud cause of action." (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1110 [23 Cal.Rptr.2d 101, 858 P.2d 568].) Nowhere does the complaint allege that ATT's misrepresentation to a third party regarding plaintiff's intent to switch 800 service was *relied upon by plaintiff* to his detriment. Rather the complaint steadfastly alleges plaintiff was at all material times, *unaware* of the misrepresentation.

It is true that California courts recognize the principle of indirect misrepresentation, under which a knowingly false statement is no less actionable because it was made to an intermediary who then *conveyed it* to the party ultimately injured. (*Varwig v. Anderson-Behel Porsche/Audi, Inc.* (1977) 74 Cal.App.3d 578, 580 [141 Cal.Rptr. 539]; *Massei v. Lettunich* (1967) 248 Cal.App.2d 68, 73 [56 Cal.Rptr. 232].) However, this doctrine requires that the defendant intend or has reason to expect that it will be *"repeated and acted upon by the plaintiff."* (*Geernaert v. Mitchell* (1995) 31 Cal.App.4th 601, 605-606 [37 Cal.Rptr.2d 483], italics added; see also *Shapiro v. Sutherland* (1998) 64 Cal.App.4th 1534, 1548 [76 Cal.Rptr.2d 101]; Rest., *supra,* § 533.) Plaintiff does not allege that ATT either intended or expected its false statement regarding the switch in 800 service to reach his ears. Just the opposite was true: to be successful, ATT's plan required that the switch be *concealed* from plaintiff so that he would *not act on it*, a plan which the

complaint alleges ATT implemented by hiding the 800 charges in its phone bill.

Nor does the doctrine of "indirect reliance" help plaintiff. Under the principle of indirect reliance, a fraudulent misrepresentation is actionable if it was communicated to an *agent* of the plaintiff and was acted upon by the agent to the plaintiff's damage. A classic example of indirect reliance would be a drug manufacturer's misrepresentation to physicians about the safety of its drug. A patient injured by the drug is permitted to sue the manufacturer for fraud without proof that his doctor repeated the falsehood to him, under the theory that the doctor was acting as plaintiff's agent. (*Allen v. G.D. Searle & Co.* (D.Or. 1989) 708 F.Supp. 1142, 1160-1161; *Grinnell v. Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 441 [79 Cal.Rptr. 369].) The concept does not work here even if we accept plaintiff's hypothesis that Pac Bell "relied" on the misrepresentation in its capacity as his agent because of the tenuous proximate connection between Pac Bell's *reliance* on the false statement (release of plaintiff's 800 number to ATT) and the loss of business of which plaintiff complains.

Clearly, the real reason plaintiff lost his business was because the switch in 800 service was *concealed* by ATT. Because ATT *suppressed* this material fact, plaintiff had no idea that the termination of his long-distance service would also disconnect his 800 number. The disconnection, which sabotaged his business, occurred because plaintiff was kept in the dark about the switch in service. This raises the crucial question: despite its flaws in pleading affirmative fraud, did the complaint state a valid cause of action for fraudulent *concealment*? We believe it did.

## III

### *Fraudulent Concealment as a Viable Theory*

Not every fraud arises from an affirmative misstatement of material fact. "The principle is fundamental that '[deceit] may be negative as well as affirmative; it may consist of suppression of that which it is one's duty to declare as well as of the declaration of that which is false.' [Citations.] Thus section 1709 of the Civil Code provides: 'One who wilfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.' Section 1710 of the Civil Code in relevant part provides: 'A deceit, within the meaning of the last section, is either: . . . 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; . . .'" (*Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 735 [29 Cal.Rptr. 201, 8 A.L.R.3d 537].)

According to section 550 of the Restatement, a party "who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering." "[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 612-613 [7 Cal.Rptr.2d 859] (*Marketing West.*)

██ Reading the complaint liberally and as a whole, all of these elements are present. Initially ATT "slammed" plaintiff's 800 telephone number, appropriating it for itself through false representation to third parties, but the misrepresentation did not complete the tort. After the "slam," ATT allegedly suppressed the 800 switch and concealed it from plaintiff by hiding the charges within its long-distance bill. The surreptitious switch and its concealment from plaintiff were a breach of duty by ATT to plaintiff, a long-distance customer. It may be inferred that ATT concealed the switch with fraudulent intent, for the purpose of making a profit; it may also be inferred that plaintiff, who was unaware of the switch, would have acted differently had he known of the suppressed fact. Specifically, plaintiff would never have permitted termination of his ATT long-distance service had he known that it would have the simultaneous effect of pulling the plug on his 800 number. (At a minimum, plaintiff would have acted differently, by taking steps to ensure a continuity of 800 service on which he relied for his livelihood.) A complete proximate cause relationship between the suppression or concealment of the material fact and plaintiff's damage is thus readily deducible from the complaint.

It is apparent that the alleged tort committed by ATT was not merely the slamming of plaintiff's 800 telephone number. This conduct merely set the stage for ATT's willful suppression of material fact, which forms the basis of plaintiff's cause of action for negative fraud.

*Stevens v. Superior Court* (1986) 180 Cal.App.3d 605 [225 Cal.Rptr. 624] (*Stevens*) illuminates our point. *Stevens* involved a fraud complaint by a patient against a hospital, alleging that the hospital allowed unlicensed foreign physicians to practice medicine on its premises. (*Id.* at p. 607.) The

patient alleged that defendant hospital concealed this fact from her, that one of the unlicensed physicians participated in a cesarean section procedure which was performed on her, and as a result she suffered serious bodily injury. The superior court sustained a demurrer without leave to amend due to the absence of any allegation that any agent of the hospital made a direct, affirmative representation upon which she relied concerning the doctor's licensed status. (*Id.* at pp. 607-608.)

The *Stevens* court reversed. The court noted that "[i]t is, . . . established by statute that intentional concealment of a material fact is an alternative form of fraud and deceit equivalent to direct affirmative misrepresentation. (Civ. Code, §§ 1572, subd. 3, 1709, and 1710, subd. 3.)" (*Stevens, supra,* 180 Cal.App.3d at pp. 608-609.) Further, " ' "[w]here failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative misrepresentation is tenuous. Both are fraudulent. *An active concealment has the same force and effect as a representation which is positive in form.*" ' " (*Id.* at p. 609, citing *Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 37 [124 Cal.Rptr. 852], italics added.) The court concluded that the complaint adequately pleaded a cause of action for fraudulent concealment. (*Stevens, supra,* at p. 610.)

Important to the *Stevens* result was the fact that the hospital's retention of an unlicensed doctor did not complete the tort, but was only a first step in the perpetration of the fraud. The conduct which formed the gravamen of the action was the *willful concealment* of that fact from the patient, with its concomitant increased risk to her health. (*Stevens, supra,* 180 Cal.App.3d at p. 610.) Similarly here, ATT's wrongful appropriation of plaintiff's 800 number through false pretenses was not the sum of its tortious activity. It was the subsequent *fraudulent concealment* from plaintiff, with its attendant risks to his business, which forms the linchpin of the fraud claim.

When viewed as a cause of action for negative fraud rather than affirmative misrepresentation, the complaint suffers none of the defects noted by the trial court. There is no problem with reliance, since the only type of reliance required is that "the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact." (*Marketing West, supra,* 6 Cal.App.4th at p. 613.) Here, it is alleged that when plaintiff allowed his long-distance service to be terminated over a billing dispute, his 800 telephone service, on which his business depended, was also terminated because the two were secretly tied together by ATT. Nor is there an insurmountable proximate cause problem. Owing to the concealment, plaintiff's 800 number was unknowingly terminated, causing his

business to dry up. The complaint thus pleads an ascertainable and identifiable proximate cause connection between ATT's deceptive conduct and the damage.[3]

We conclude the complaint states a cause of action for fraudulent concealment despite its apparent label as fraud based on affirmative misrepresentation. ■ " 'It is an elementary principle of modern pleading that the nature and character of a pleading is to be determined from its allegations, regardless of what it may be called, and that the subject matter of an action and issues involved are determined from the facts alleged rather than from the title of the pleadings . . . .' " (*Jaffe v. Carroll* (1973) 35 Cal.App.3d 53, 57 [110 Cal.Rptr. 435].) ■ The trial court erred in granting ATT's motion for judgment on the pleadings based on a failure sufficiently to plead the elements of fraud.

## IV

### *The Filed Rate Doctrine*

■ Even if the trial court erred in granting its motion for judgment on the pleadings based on inadequate pleading, ATT contends judgment on the pleadings should be upheld on the alternative ground that plaintiff's fraud claim is barred by the "filed rate doctrine." The filed rate doctrine was not relied on by the trial court in granting judgment on the pleadings. Furthermore, in denying ATT's earlier motion for summary judgment, the court ruled the filed rate doctrine posed no bar to the action. However, since we must affirm if the judgment was correct on any theory (see *Hendy v. Losse* (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1]; *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568 [253 Cal.Rptr. 693, 764 P.2d 1070]), we take up the issue.

"The Federal Communications Act (the FCA) requires telecommunication common carriers to file schedules, known as tariffs, with the FCC [Federal Communications Commission]. These tariffs must show all charges and the classifications, practices and regulations affecting those charges. (47 U.S.C. § 203(a).) The contents of the tariff are subject to FCC approval. (47 U.S.C. § 203(b)(2).) These filed tariffs are the equivalent of federal regulations which have the force of law. [Citations.]" (*Duggal v. G.E. Capital Communications Services, Inc.* (2000) 81 Cal.App.4th 81, 87 [96 Cal.Rptr.2d 383] (*Duggal*).)

---

[3]We offer no view as to the likelihood that plaintiff can prove the proximate cause element of his fraud cause of action at trial. Because the case was disposed of by judgment on the pleadings, the issue is immaterial.

■ The filed rate doctrine " 'forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority.' [Citation.] '[T]he [FCA] does not permit either a [customer's] ignorance or the carrier's misquotation of the applicable rate to serve as a defense to the collection of the filed rate.' [Citation.] 'Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and [customer]. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.' [Citations.]" (*Fax Telecommunicaciones, Inc. v. AT&T* (2d Cir. 1998) 138 F.3d 479, 488 (*Fax*).)

The doctrine serves two goals: it assures nondiscrimination between customers and promotes agency autonomy in rate setting without judicial interference. (*Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, 335 [74 Cal.Rptr.2d 55] (*Day*).) "The practical effect of the doctrine is to bar customers from suing to challenge a utility's failure to provide services at rates other than those stated in the tariff." (*Duggal, supra,* 81 Cal.App.4th at p. 88.)

■ ATT's FCC tariff No. 2, which was in effect at the time, limits its liability for interruption in telephone service.[4] ATT maintains that because plaintiff is seeking damages for termination of his 800 service, he is seeking relief which would contravene the prescribed tariff, a result forbidden by the filed rate doctrine. ATT is mistaken.

In *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.* (1998) 524 U.S. 214 [118 S.Ct. 1956, 141 L.Ed.2d 222] (*Central Office*), the United States Supreme Court elucidated the parameters of the filed rate doctrine. There, the carrier, petitioner AT&T, allegedly promised to the respondent Central Office, a reseller of long-distance services, special promotional discounts and services not available to other customers if it would enter into a four-year contract. When AT&T failed to deliver, Central Office sued and won a jury verdict in the federal district court against AT&T for fraudulent misrepresentation and tortious interference with contract. (*Id.* at pp. 219-221 [118 S.Ct. at pp. 1961-1962, 141 L.Ed.2d at pp. 229-232].)

The Supreme Court reversed, holding that enforcement of the judgment would contravene the filed rate doctrine by, in effect, granting the plaintiff

---

[4]Tariff No. 2.3.1-A provides, in part: "The Company's liability, if any, for its willful misconduct is not limited by this tariff. With respect to any other claim or suit, by a Customer or by others, for damages associated with the installation, provision, *termination,* maintenance, repair or restoration of [800 telephone service] . . . the Company's liability, if any, shall not exceed an amount equal to the monthly recurring charge provided for under this tariff for Custom 800 Services or, in the case of AT&T 800 Service and AT&T WATS, the monthly charges for access lines therewith." (Italics added.)

preferences in service and rates not available to other customers and not included in the published tariff. (*Central Office, supra,* 524 U.S. at pp. 224-226 [118 S.Ct. at pp. 1963-1964, 141 L.Ed.2d at pp. 234-235].) ■ Moreover, it did not matter whether AT&T's conduct was negligent or fraudulent: all customers are charged with knowledge of the tariffs; thus "even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." (*Id.* at p. 222 [118 S.Ct. at pp. 1962-1063, 141 L.Ed.2d at p. 233], citing *Kansas City S. R. Co. v. Carl* (1913) 227 U.S. 639, 653 [33 S.Ct. 391, 395, 57 L.Ed. 683, 688-689].)

In an insightful concurring opinion, Chief Justice Rehnquist observed that the filed rate doctrine applied because "the acts of tortious interference asserted against AT&T amount to no more than an intentional refusal to provide services to respondent in an amount or manner contrary to the filed tariff." (*Central Office, supra,* 524 U.S. at pp. 228-229 [118 S.Ct. at p. 1966, 141 L.Ed.2d at p. 237].) The Chief Justice went on to explain: "The tariff does not govern, however, the entirety of the relationship between the common carrier and its customers. For example, *it does not affect whatever duties state law might impose on [AT&T] to refrain from intentionally interfering with respondent's relationships with its customers by means other than failing to honor unenforceable side agreements*, or to refrain from engaging in slander or libel, or to satisfy other contractual obligations. The filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides .to its customers the services covered by the tariff. *It does not serve as a shield against all actions based in state law.*" (*Id.* at pp. 230-231 [118 S.Ct. at pp. 1966-1967, 141 L.Ed.2d at p. 238], italics added.)

Justice Rehnquist's view is supported by California case law. As the Court of Appeal stated in *Day,* "the doctrine furthers two legitimate goals: nondiscriminatory rate setting and agency autonomy in rate setting without court interference. (*Wegoland Ltd.* v. *NYNEX Corp.* (2d Cir. 1994) 27 F.3d 17, 21.) The Act is intended to protect those goals, and to occupy the field for claims which implicate them. *The Act, however, is not completely preemptive.* It contains a savings clause which provides that nothing contained therein 'shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.' (47 U.S.C. § 414.) This clause has been interpreted as 'preserv-[ing] . . . state claims that address obligations different from those created by the Communications Act.' " (*Day, supra,* 63 Cal.App.4th at p. 335, citing *Marcus v. AT & T Corp.* (S.D.N.Y. 1996) 938 F.Supp. 1158, 1168, affd. (2d Cir. 1998) 138 F.3d 46, italics added.)

The *Day* court went on to hold that the filed rate doctrine did not prevent a consumer group from maintaining an action to enjoin, as an unfair and deceptive business practice, ATT's practice of concealing "rounding up" charges to the next minute in advertising its prepaid phone cards, since awarding injunctive relief would neither interfere with government rate-setting or amount to judicial interference with the tariffs for services charged by the carriers. (*Day, supra,* 63 Cal.App.4th at p. 336.)[5]

In *Duggal,* while affirming the dismissal of a complaint alleging negligence of a carrier in failing to provide timely services, because it would amount to a "disguised retroactive rate adjustment" (*Duggal, supra,* 81 Cal.App.4th at p. 91), the court embraced Justice Rehnquist's view that "[t]he filed rate doctrine preempts only those suits which seek to alter the terms and conditions of a tariff," leaving intact a whole range of common law tort actions against a carrier. (*Id.* at p. 90.)[6]

Compensating plaintiff for the tortious conduct pleaded here would not contravene the filed rate doctrine. Plaintiff is not seeking rate preferences not accorded to ATT's other customers, or to enforce "side agreements" which vary from published tariffs. The claim is that plaintiff *would never have been a customer at all* were it not for ATT's deceptive and fraudulent behavior. Plaintiff asserts that ATT clandestinely stole his 800 telephone number, thereby creating a secret customer-carrier relationship by false pretenses, concealing the theft from him so that when he allowed termination of his long-distance service he unknowingly cut off an important source of his business referrals. If proved, awarding damages for such conduct would neither involve the court in tariff setting nor enforce discrimination against other ATT customers. Consequently, it falls squarely within the savings clause of the FCA (47 U.S.C. § 414) which permits state law actions against carriers which do " 'not frustrate [the] Act's purposes of uniformity and agency ratemaking.' " (*Day, supra,* 63 Cal.App.4th at p. 336, citing *Marcus v. AT & T Corp., supra,* 938 F.Supp. at p. 1172.)

---

[5]The court did rule that the plaintiffs' prayer for "disgorgement" of "ill-gotten gains" realized from the alleged unlawful practice (*Day, supra,* 63 Cal.App.4th at p. 337) *was* barred by the filed rate doctrine, because "[a]ny attempt to calculate a monetary amount to be paid on behalf of those who purchased the cards would necessarily result in a refund or rebate of properly collected fees for services." (*Id.* at p. 340.)

[6]As the court in *Duggal* noted, Justice Stevens's dissent in *Central Office* cites evidence at trial showing there was intentionally tortious conduct by AT&T which was unrelated to the side agreement to enforce rates different from the tariff, and therefore not precluded by the filed rate doctrine. This conduct included deceptive billing disclosures and the "slamming" of customers. The *Central Office* majority did not dispute Stevens's observations, answering only that this issue was not within the scope of the court's review. (*Duggal, supra,* 81 Cal.App.4th at p. 90, citing *Central Office, supra,* 524 U.S. at pp. 233, 226-227, fn. 2 [118 S.Ct. at pp. 1967-1968, 1965, 141 L.Ed.2d at pp. 239-240, 235-236].)

ATT's claim that "there is no fraud exception to the filed rate doctrine" is true but irrelevant, as illustrated by its reliance on *Fax, supra,* 138 F.3d 479. There, the plaintiff, Fax Telecommunicaciones, Inc., alleged that ATT fraudulently induced it to become a customer by making false promises to provide long-distance services at rates significantly lower than the published tariffs. In opposition to summary judgment, Fax presented evidence that ATT repeatedly assured Fax it would file a new contract tariff with the FCC which would incorporate the lower rates. (*Id.* at pp. 481, 484.) The court held the filed rate doctrine precluded the action because enforcement of the promised rate would contradict the published tariff and thereby discriminate against other customers. Moreover, it made no difference whether ATT's intent was innocent or fraudulent; since the customer is bound by the published rate, any reliance on a promise to provide telephone service at a different rate would be conclusively unreasonable. (*Id.* at p. 490.) *Fax* stands for the principle that side agreements which vary from the tariff are unenforceable, even where promisor gives assurances that the tariff will change at some point in the future.

The maxim that there is no "fraud" exception to the filed rate doctrine means that courts will not intrude into the FCC's jurisdiction by enforcing promises to charge rates or provide services which vary from the filed tariff, regardless of the promisor's intent. It does *not* mean that all fraudulent conduct committed by a carrier is immune from remedy. (See *Cooperative Communications, Inc. v. AT&T Corp.* (D. Utah 1994) 867 F.Supp. 1511 1514-1517 [complaint alleging carrier's systematic campaign to drive competitor out of business through use of fraudulent representations not barred by the filed rate doctrine].)

We conclude the filed rate doctrine has no application here. The purposes of the filed rate doctrine are not compromised by permitting a state law remedy for a carrier's wrongful conduct in "slamming" a customer's telephone service and then concealing the "slam" from the customer. The right infringed upon was not plaintiff's right to uninterrupted service, but plaintiff's right not to have ATT as its 800 service provider without his knowledge and against his wishes. As the court in denying summary judgment aptly put it, ATT cannot fraudulently create a customer-carrier relationship and then rely on the same relationship to shield itself from liability.

THE CROSS-APPEAL

ATT has filed a cross-appeal, which urges that even if the trial court erred by granting the motion for judgment on the pleadings, no miscarriage of justice occurred because its earlier summary judgment motion should have

been granted. ATT may seek review of the intermediate summary judgment ruling for the purpose of showing that plaintiff-appellant was not harmed by the error of which he complains. (See Code Civ. Proc., § 906; *Erikson v. Weiner* (1996) 48 Cal.App.4th 1663, 1671 [56 Cal.Rptr.2d 362].)

*Filed Rate and Fraud*

The grounds of ATT's cross-appeal are: (1) the preclusive effect of the filed rate doctrine, and (2) the dearth of evidence that ATT ever made a false representation to either plaintiff or his alleged agent, Pac Bell, regarding plaintiff's 800 service switch. Both of these are nonmeritorious in light of the foregoing discussion, specifically:

1. The filed rate doctrine does not apply because an award of damages for ATT's tortious conduct would not interfere with FCC autonomy in ratemaking or discriminate against similarly situated customers of ATT; and

2. The fact that ATT made no affirmative representation about the 800 service switch to plaintiff, but rather concealed the switch, poses no bar to a cause of action based on negative fraud, i.e., fraudulent concealment.

*Summary Judgment on the Issue of Concealment*

In its "Cross-Appellant's Reply Brief" and again in supplemental letter briefing, ATT asserts that its summary judgment papers precluded any triable issue of fact about concealment because all plaintiff had to do was read his monthly statements to discover he was being charged by ATT for 800 service. ATT refers us to 65 pages of computer-generated printouts which were attached to the declaration of its employee Susan King. This evidence, however, is not sufficient to remove all triable issues on concealment.

Ms. King's declaration imprecisely states that the attachments were "forwarded to plaintiff." It does not indicate who sent them or when they were sent; nor does the declaration attempt to lay a foundation which would bring the documents within the business records exception to the hearsay rule. Notably, ATT failed to produce easily obtainable evidence (such as discovery admissions) showing that it clearly disclosed to plaintiff that he was being separately charged for 800 service.[7]

We also note plaintiff's opposition evidence that, after assuming control of plaintiff's 800 service, ATT did not change the account number or the

---

[7]At the time of the events in question, former Public Utilities Code section 2889.5 (Stats. 1995, ch. 664, § 1) contained certain mandatory disclosure requirements for a carrier to follow when making any change in the provider of telephone service. Included among them

account designation from Small Business Advantage to Small Business Advantage Plus (ATT's title for a small business account with 800 service attached), that plaintiff continued to receive bills for 800 service from Pac Bell after the switch, and that the notices from ATT regarding disconnection of long-distance service nowhere indicated that 800 service was also being disconnected.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with directions to deny ATT's motion for judgment on the pleadings and for further proceedings consistent with this opinion. Plaintiff shall recover costs on appeal.

Nicholson, Acting P. J., and Raye, J., concurred.

A petition for a rehearing was denied October 5, 2001, and the opinion was modified to read as printed above.

---

were to "[t]horoughly inform the subscriber of the nature and extent of the service being offered" (Pub. Util. Code, § 2889.5, subd. (a)(1)(A)), verifying whether the subscriber intends to make the change by "[m]ail[ing] to the subscriber an information package seeking confirmation of his or her change in the telephone corporation and describing the new service, including a postage prepaid postcard that the customer can use to deny, cancel, or confirm a service order, . . ." (Pub. Util. Code, § 2889.5, subd. (a)(1)(B)(ii)), and *obtaining the subscriber's signature on a document* fully explaining the nature and extent of the action . . . ." (Pub. Util. Code, § 2889.5, subd. (a)(1)(B)(iii), italics added.) In its moving papers, ATT did not offer proof that it complied with any of these disclosure provisions. In light of these apparent violations of California law, ATT's assertion that there was no concealment as a matter of law rings hollow.