[No. C037158. Third Dist. Feb. 6, 2002.]

ANANDA CHURCH OF SELF-REALIZATION, Plaintiff and Appellant,
v.
MASSACHUSETTS BAY INSURANCE COMPANY, Defendant and
Respondent.

1274

COUNSEL

Oleson Law Corporation and Raymond C. Oleson for Plaintiff and Appellant.

Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone, Bruce M. Warren and Leon J. Gladstone for Defendant and Respondent.

OPINION

**CALLAHAN, J.**—Plaintiff Ananda Church of Self-Realization (Ananda) appeals from a judgment after the trial court sustained, without leave to amend, a demurrer to its complaint against Massachusetts Bay Insurance Company (Mass Bay) alleging breach of Mass Bay's obligations to defend and indemnify Ananda against two lawsuits.

At issue is whether a lawsuit by a claimant against an insured, arising out of the alleged wrongful taking of documents from the trash can of the claimant's attorney, raised a potential claim for "property damage" under Mass Bay's general liability policy.

We conclude there was no potential coverage under the applicable policy provision and affirm the judgment.

## BACKGROUND

██ Since this case was disposed of by demurrer, we accept as true all well-pleaded material facts in the complaint. (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 8, fn. 3 [32 Cal.Rptr.2d 244, 876 P.2d 1043]; *Serrano v. Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) We exercise our independent judgment in reviewing a demurrer to determine whether the factual allegations of the complaint state a cause of action. (*Schmidt v. Foundation Health* (1995) 35 Cal.App.4th 1702, 1706 [42 Cal.Rptr.2d 172].) We give the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; see *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) If no liability exists as a matter of law, we must affirm the judgment. (See *Baughman v. State of California* (1995) 38 Cal.App.4th 182, 187 [45 Cal.Rptr.2d 82].)

Ananda's second amended complaint (the complaint) was filed against several insurance companies, including Mass Bay. The coverage dispute

arises from two underlying lawsuits against Ananda. All of our information about the underlying suits is derived from the complaint, which we summarize below, as it pertains to Mass Bay.

### The Bertolucci Suit

On November 21, 1994, Anne-Marie Bertolucci filed an action against Ananda, its subsidiary entity Crystal Clarity Publishing (Crystal Clarity), and other named individual employee-defendants.

This lawsuit, which we shall refer to as the Bertolucci suit, was directed primarily at the behavior of Ananda minister and Crystal Clarity vice-president Danny Levin, who allegedly sexually harassed Bertolucci while she was employed by Crystal Clarity as a data entry clerk. Bertolucci sought redress against Ananda under legal theories which included wrongful discharge, violations of the California Fair Employment and Housing Act, battery, and negligent supervision.[1]

### The Mass Bay Policy

From August 18, 1997, to August 18, 1998, Ananda held a policy of insurance issued by Mass Bay. The key provisions of that policy were as follows: "[Mass Bay] will pay those sums that [Ananda] becomes legally obligated to pay as damages *because of. . . 'property damage'* to which this insurance applies. [¶] '[P]roperty damage' is defined to mean 'a. *Physical injury to tangible property*, including all resulting loss of use of that property; or b. *Loss of use of tangible property* that is not physically injured.' " (Italics added.) The policy went on to provide that Mass Bay shall "have the right and duty to defend any 'suit' seeking those damages."

### The Murphy Suit

On February 17, 1998, Bertolucci, who was by then known as Anne-Marie Murphy, filed a second lawsuit captioned Murphy v. Walters (hereinafter the Murphy suit).

As amended, the Murphy suit alleged that on September 29, 1995, while her suit against Ananda was in progress, Murphy's attorneys caught an

---

[1]Ananda also alleges that other insurers wrongfully refused to provide it a defense to the Bertolucci suit, which was tried to a jury verdict in favor of Bertolucci in August 1998. These allegations are not apposite here.

individual identified as Peter Barranco trespassing on their property and stealing two bags of trash containing private, confidential attorney communications. The Murphy suit alleged that Barranco was an agent of a private investigator for Ananda's in-house counsel, who had hired him to trespass on the attorneys' property. Upon being caught in the act, Barranco tried to hit one of the attorneys as he drove away, then delivered the two bags of trash to the private investigator. The investigator in turn delivered "selected documents" from the contents of the trash to members of Ananda's litigation team, who were still in possession of them. Murphy sought redress against Ananda and its litigation team under a host of stated causes of action including conversion, claim and delivery, invasion of privacy, and conspiracy to steal personal property.

Ananda tendered the Murphy suit to Mass Bay for defense and indemnification, but Mass Bay refused.

### The Flynn Suit and the Settlement of All Litigation

On October 8, 1998, Michael J. Flynn and other attorneys representing Murphy filed a motion in superior court to add Ananda as a defendant in their lawsuit entitled Flynn v. Walters (the Flynn suit). The Flynn suit was based on the same incident as the Murphy suit, i.e., that on or about September 29, 1995, Barranco "illegally trespassed onto [plaintiffs'] private property and stole [their] documents contained in the trash held in a gated secured and enclosed area on [their] property. . . ." The Flynn plaintiffs sought redress on a number of legal theories which included trespass, conversion, and interference with business relations.

Ananda tendered the Flynn suit to Mass Bay for defense and indemnification, but Mass Bay refused. The cost of defending the Murphy and Flynn suits coupled with the financial burden of the Bertolucci suit drove Ananda to the point of insolvency, and forced it to declare bankruptcy. In the bankruptcy court, Ananda eventually settled the Bertolucci, Flynn, and Murphy suits, without the participation of its insurers, for an estimated $1.8 million.

### Ananda's Causes of Action Against Mass Bay

. In the present complaint, Ananda posited causes of action against Mass Bay for (1) breach of written contract, based on failure to defend the Murphy and Flynn suits; (2) declaratory relief, seeking a determination that Mass Bay had a duty to pay the settlement, (3) "Promissory fraud" and negligent misrepresentation, based upon Mass Bay's alleged false representations

regarding defense and coverage, (4) tortious breach of the covenant of good faith and fair dealing, and (5) negligence.

Mass Bay demurred to the complaint on the ground, inter alia, that the recitation of facts alleged in the Murphy and Flynn suits failed to give rise to the potential for a covered claim under the Mass Bay policy. The trial court sustained Mass Bay's demurrer to Ananda's complaint without leave to amend and issued judgment in favor of Mass Bay. Ananda appeals.

APPEAL

I

*Principles of Insurance Law*

■ Both parties agree the dispositive issue on appeal is whether the Murphy and Flynn suits pleaded facts which could give rise to a duty on the part of Mass Bay to defend Ananda under the property damage provision of Ananda's liability insurance policy.

■ The California Supreme Court has described the duty to defend as follows: "a liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. (*Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168] (*Gray*).) As we said in *Gray*, 'the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy.[2] ([*Gray*] at p. 275, italics in original.) Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.] [¶] The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the

---

[2]Ananda argues that *Gray* creates two alternative "prongs" through which a duty to defend can be found: the "potential coverage prong" measured against the language of the policy, and a "reasonable expectations prong" measured against whether an insured would reasonably expect coverage for the kind of risk under the policy. This is an incorrect statement of the law.

The "reasonable expectations" doctrine is not an alternative basis for finding a duty to defend. The doctrine is triggered only where a policy provision or exclusion is *uncertain* or *ambiguous,* in which case the court's inquiry would turn to what a reasonable purchaser of the policy would expect. (*Gray, supra,* 65 Cal.2d at pp. 269-270; Croskey & Kaufman, Cal. Practice Guide: Insurance Litigation (The Rutter Group 2001) ¶¶ 7:561, 7:562, p. 7B-18.) Where no ambiguity or uncertainty in the coverage provisions of a policy exists, the insured cannot "reasonably" expect a defense and the "reasonable expectations" doctrine becomes immaterial. (*Id.* at ¶ 7:563, p. 7B-19 (rev. #1 1999), citing *B & E Convalescent Center v. State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 99-100 [9 Cal.Rptr.2d 894].)

terms of the policy." (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) "The rule is settled that an insurer is under a duty to defend a claim *whenever the allegations of a complaint would support a recovery upon a risk covered by the policy.*" (*Hogan v. Midland National Ins. Co.* (1970) 3 Cal.3d 553, 563 [91 Cal.Rptr. 153, 476 P.2d 825], italics added.) Contrawise, "[i]f an insurance policy provides no potential basis for coverage, the insurer is under no duty to defend an action against the insured." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 37 [44 Cal.Rptr.2d 370, 900 P.2d 619], citing *Gray, supra,* 65 Cal.2d at p. 276.)

## II

### *The Temporal Issue*

Ananda devotes a large part of its opening brief to demonstrating the possibility of coverage temporally. It asserts that, although the trash incident occurred in September 1995, some two years prior to the inception of coverage under the Mass Bay policy, the complaint left open the possibility that some of the "stolen" property was destroyed by defendants on later dates; further, the fact that the Murphy and Flynn plaintiffs alleged that defendants were still in the *possession* of the property and demanded its return suggested the potential for injury to or loss of use continuing beyond the initial trash-taking incident and into the policy period.

We find it unnecessary to delve into these temporal issues, because they become relevant only if the Murphy and Flynn suits raised damage claims that could potentially be covered under the Mass Bay policy. If there is no potential for *coverage,* there is no duty to defend, regardless of whether the alleged loss took place during the policy period. We therefore turn directly to the coverage issue.

## III

### *The Policy Provisions and Ananda's Argument*

We initially examine the "property damage" provision of the Mass Bay policy. That provision insures against sums the insured becomes obligated to pay because of property damage. As noted, "property damage" is precisely defined as *either* "a. Physical injury to tangible property, including all resulting loss of use of that property; or b. Loss of use of tangible property that is not physically injured."

In other words, coverage is triggered by a potential damage award against the insured and in favor of a third party for injury to or loss of use of tangible property.

Citing dictionary definitions of "tangible property" as that which may be touched, smelled, or sensed and has corporeal form, Ananda asserts that the Murphy and Flynn plaintiffs were seeking monetary damages for the value (however small) of physical materials (documents) fitting this definition. Ananda points out that the Murphy and Flynn suits set forth causes of action for claim and delivery, conversion, and conspiracy to steal documents containing attorney-client information, suggesting the plaintiffs are seeking damages for the value of their documents or their return, claims which at least potentially are coverable under the Mass Bay policy.

For the reasons which follow, we conclude that no claim for conversion or other interference with personal property rights may be based on the taking of documents placed in a trash can. Further, whatever damages may be awardable to the Murphy and Flynn plaintiffs for defendants' use of the *information* contained in the trashed documents, no recovery may be based on injury to or loss of use of the documents as "tangible property" within the policy definition.

## IV

### *Trash as Personal Property*

██ We start with the well-established principle that a court is not bound by the captions or labels of a cause of action in a pleading. The nature and character of a pleading is to be determined from the *facts alleged*, not the name given by the pleader to the cause of action. (See *Lovejoy v. AT&T Corp.* (2001) 92 Cal.App.4th 85, 98 [111 Cal.Rptr.2d 711].) ██ Thus, regardless of whether the complaint gives the causes of action a label imbued with personal property law meaning, it is the *facts* behind the label which govern the nature and character of the primary right sued upon.

██ Conversion is the "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." (Rest.2d Torts, § 222A.) Although, unlike conversion, "claim and delivery" denominates a remedy rather than a tort, it too is grounded in the concept of interference with personal property rights. "Claim and delivery is a remedy by which a party with a superior right to a specific item of personal property (created, most commonly, by a contractual lien) may recover

possession of that specific property before judgment." (*Waffer Internat. Corp. v. Khorsandi* (1999) 69 Cal.App.4th 1261, 1271 [82 Cal.Rptr.2d 241].)

Without a predicate claim of ownership or possession, the Murphy and Flynn plaintiffs could not receive an award of damages for interference with *personal property rights*. " 'To establish a conversion, plaintiff must establish an actual interference with his *ownership or right of possession. . . .* Where plaintiff neither has title to the property alleged to have been converted, nor possession thereof, he cannot maintain an action for conversion.' " (*Moore v. Regents of University of* California (1990) 51 Cal.3d 120, 136 [271 Cal.Rptr. 146, 793 P.2d 479] (*Moore*), quoting *Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 610-611 [176 Cal.Rptr. 824], italics added by *Moore*.)

█ Documents which have been placed in an outdoor trash barrel no longer retain their character as the *personal property* of the one who has discarded it. By placing them into the garbage, the owner renounces the key incidents of ownership—title, possession, and the right to control. As the Indiana Court of Appeals stated in reversing an award of damages for conversion based on the defendants' removal of documents from a trash Dumpster, "there is a widely held and long-standing doctrine that personalty discarded as waste is considered abandoned. *See United States v. Wiederkehr*, 33 M.J. 539, 541 (A.F.C.M.R.1991) ('Abandoned property is property the owner has thrown away.'); *Ex parte Szczygiel*, 51 N.Y.S.2d 699, 702 (Sup.Ct.1944) ('The abandonment of property is the relinquishment of all title, possession or claim to or of it—a virtual intentional throwing away of it.'); *Eads v. Brazelton*, 22 Ark. 499, 509 (1861) ('Property is said to be abandoned when it is thrown away . . . .'); *M'Goon v. Ankeny*, 11 Ill. 558, 559 (1850) . . . .); William T. Brantly, *Of the Law of Personal Property* § 133, at 213-14 (1891) ('A thing is. abandoned when the owner throws it away, or leaves it without custody, because he no longer wishes to account it as his property[.]')." (*Long v. Dilling Mechanical Contractors* (Ind. Ct.App. 1999) 705 N.E.2d 1022, 1025.)[3]

---

[3]In its minute order, the trial court opined that in this state, garbage is apparently capable of being converted, because in California "the owner of property retains a reasonable expectation of privacy in his/her/its 'trash' until the trash has lost its identity and meaning by becoming part of a large conglomeration of trash elsewhere; . . ."

The court erred in two respects. First, to support its statement, the court relied entirely on the discussion of California law in *Tennant Co. v. Advance Mach. Co., Inc.* (Minn.Ct.App. 1984) 355 N.W.2d 720. *Tennant* cites *People v. Krivda* (1971) 5 Cal.3d 357, 367 [96 Cal.Rptr. 62, 486 P.2d 1262], for the purported rule. (355 N.W.2d at p. 725.) *Krivda*, however, was effectively overruled by the United States Supreme Court in *California v. Greenwood* (1988) 486 U.S. 35, 38-39 [108 S.Ct. 1625, 1627-1628, 100 L.Ed.2d 30, 35-36] in which the high

The *Moore* case cited by Ananda lends more harm than support to its position. In *Moore*, a patient sued his physician for removing and using tissue cells from his body without his consent. While the court held that Moore could state a cause of action for breach of the physician's duty of disclosure (*Moore, supra,* 51 Cal.3d at pp. 124-125), it also ruled that he could not recover for conversion or any other tort theory which presupposed that the cells were plaintiff's "property." (*Id.*at pp. 136-137.) The decision was based, in significant part, on the fact that certain sections of the Health and Safety Code restricted how excised cells may be used and required their eventual destruction. (*Id.* at pp. 140-141.) If a plaintiff cannot sue for the "value" of tissues removed from his body and ultimately used for research purposes, he has even less of a claim to a money damage award for the "value" of materials placed in a trash can for anticipated hauling away and destruction.[4]

Since all of the documents at issue had been dumped in the trash, the Murphy and Flynn suits did not raise the potential of a damage award based on interference with or deprivation of their personal property.

## V

### *The Tangibility Requirement*

As a separate and independent ground for our decision, we find that, even assuming the Murphy and Flynn plaintiffs retained some residual ownership rights in the documents taken from their trash can, there would still be no potential for coverage, because the primary rights sought to be vindicated could not be those attached to "*tangible* property" as required by the policy.

The property damage provision here clearly and specifically limits coverage to injury to or loss of use of "tangible property." The California Supreme

court upheld a warrantless search of trash barrels against Fourth Amendment privacy claims. (See discussion in 4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Illegally Obtained Evidence, § 213, pp. 851-852.)

Second, and more fundamentally, Fourth Amendment principles which may be useful in resolving a criminal search and seizure dispute are of little relevance to a civil claim for *conversion of personal property*. (See *Moore, supra,* 51 Cal.3d at p. 138, fn. 28.) The question whether the state's agents violate a person's reasonable expectation of *privacy* by seizing items placed in the trash for purposes of the constitutional prohibition on unreasonable searches raises materially different issues than whether one may maintain an action for interference with property rights based on the seizure of those same items by a private party.

[4]Contrary to Ananda's suggestion the alleged fact that Ananda and/or its agents *destroyed* the documents at some undetermined time after their removal from the trash does not advance its claim of potential coverage. Because the Murphy and Flynn plaintiffs retained no claim to ownership or possession of the documents in the garbage, the subsequent destruction of the documents was legally irrelevant. Simply put, there was no "injury" onto which the proverbial "insult" could be added.

Court has held that the term " '[t]angible property' is not ambiguous, and coverage therefore does not turn on alternative meanings." (*Kazi v. State Farm Fire & Casualty Co.* (2001) 24 Cal.4th 871, 880 [103 Cal.Rptr.2d 1, 15 P.3d 223].) Such a provision does not insure against *intangible* property rights such as "loss of an investment, loss of goodwill or loss of intangible property use." (*Id.* at p. 879; see also Ostrager & Newman, Handbook on Insurance Coverage Disputes (11th ed. 2001) § 7.03[b][2][B], p. 368.)

The items allegedly "stolen" by Ananda's investigator from the Murphy and Flynn plaintiffs' trash can were confidential attorney-client documents, seized for the purpose of gaining unfair advantage in litigation. The fact that documents were physical objects perceivable by the senses is not determinative. In order for there to be coverage, the claimed injury had to relate to the documents' intrinsic value *as tangible property.* (See *Schaefer/Karpf Productions v. CNA Ins. Companies* (1998) 64 Cal.App.4th 1306 [76 Cal.Rptr.2d 42] [economic loss sustained by the producer of a children's program videotape when copies of the tape, including pornographic material, were inadvertently distributed to children and schools, did not constitute physical injury to, or loss of use of "tangible property" for insurance purposes.].)

To say the Murphy and Flynn plaintiffs sustained damage for "injury to" or "loss of use of" papers they had thrown in the trash would be nonsensical. Any damage for which plaintiffs were seeking compensation was caused by the alleged *improper use* of privileged or sensitive documents by their adversaries in litigation. If plaintiffs suffered monetary loss or emotional distress, it was caused not by the injury to, or the inability to use pieces of paper previously discarded, but by the *exploitation of the information* contained in those papers following their retrieval from the garbage.[5] Such strictly economic damage cannot constitute injury to or loss of use of "tangible" property for insurance purposes. (See *American Internat. Bank v. Fidelity & Deposit Co.* (1996) 49 Cal.App.4th 1558, 1572 [57 Cal.Rptr.2d 567] [insureds' "inability to construct a dream home was not physical damage to the property, it was an inability to make '[a] valuable addition . . . intended to enhance [their property's] value. . . .' [Citation.] . . . [T]he inability to construct an improvement results in only economic loss. And 'strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy. [Citations.]' "].)

---

[5]For this reason, the Murphy and Flynn plaintiffs' causes of action for trespass, invasion of privacy, and interference with business relations, i.e., the relationship between Bertolucci and her attorneys, were those apropos to the injuries they suffered.

Ananda's reliance on cases from other jurisdictions holding that conversion of items having relatively minor value may nevertheless constitute injury to tangible property (*State Farm Fire and Cas. Ins. Co. v. White* (N.D.Ga. 1991) 777 F.Supp. 952, 955 [theft of architectural plans]; *Nelson v. Want Ads of Shreveport, Inc.* (La.Ct.App. 1998) 720 So.2d 1280, 1283 [misappropriation or theft of advertising coupons]; *Retail Systems, Inc. v. CNA Ins. Companies* (Minn.Ct.App. 1991) 469 N.W.2d 735 [loss of computer tape containing valuable voter survey information]) is not persuasive, since they did not involve items considered worthless *as property*, unmistakably shown by their venue in the circular file.

Likewise, *Navistar Internat. Transportation Corp. v. State Bd. of Equalization* (1994) 8 Cal.4th 868 [35 Cal.Rptr.2d 651, 884 P.2d 108], involving the application of a tax code section imposing a tax on the sale of "tangible" assets (Rev. & Tax. Code, § 6051), is of little relevance here. In addition to the fact that the sophisticated drawings, designs, and manuals in *Navistar* obviously had intrinsic value (8 Cal.4th at pp. 872-873), the statutes and regulations found in the Revenue and Taxation Code feature unique terminology and principles of interpretation far removed from those applicable to insurance law.

To construe the provision insuring against injury to "tangible property" as embracing damage to the purely economic and privacy interests at stake in the Murphy and Flynn suits would do violence to the plain language of the policy. (See *Chatton v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 858 [13 Cal.Rptr.2d 318].) Since the only awardable damage was for harm to plaintiffs' *intangible* rights, principally the right to have their trashed documents properly destroyed and otherwise kept from the view of prying eyes, there was no potential coverage for, or duty to defend against, "injury to" or "loss of use of" tangible property within the meaning of the Mass Bay policy.

## VI

### *Remaining Tort Claims*

Because Ananda cannot maintain a cause of action for breach of duty to defend the Murphy and Flynn suits, Ananda's remaining causes of action, which are wholly derivative of that duty, are also barred. (See *Duggal v. G.E. Capital Communications Services, Inc.* (2000) 81 Cal.App.4th 81, 89 [96 Cal.Rptr.2d 383].)

## Disposition

The judgment is affirmed.

Scotland, P. J., and Davis, J., concurred.