**MULTI SOLUTIONS INTERNATIONAL, INC., a Kansas corporation; and WWWebservice.Net, Inc., a Kansas corporation, Plaintiffs,**

v.

**SOUTHWESTERN BELL TELEPHONE COMPANY, a Missouri corporation; and SBC Advanced Solutions, Inc., a Delaware corporation, Defendants.**

No. 02–4045–SAC.

United States District Court, D. Kansas.

May 27, 2003.

Kevin M. Fowler, John C. Frieden, Frieden, Haynes & Forbes, Topeka, KS, for Plaintiffs.

Curtis J. Waugh, Harold S. Youngentob, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for Defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendants' motion to dismiss (Dk. 7), and on the plaintiffs' motion for leave to file amended complaint (Dk. 21). The plaintiffs, Multi Solutions International, Inc. ("MSI") and WWWEbservice.Net, Inc. ("WWW") are internet service providers ("ISPs") seeking damages against Southwestern Bell Telephone Company ("SWB") in connection with its offering and providing of Virtual Point of Presence Dial Access Service ("VPOP–DAS") services and against SBC Advanced Solutions, Inc. ("SBC–ACI"), SWB's assignee under the contracts, in connection with its providing of VPOP–DAS services. Asserting diversity and supplemental jurisdiction, the plaintiffs plead state common-law claims of breach of contract, fraud and misrepresen- tation against SWB and a state common-law claim of breach of contract against SBC–ACI. In their motion to amend, the plaintiffs seek to add certain federal claims asserting federal question jurisdiction under 28 U.S.C. § 1331 and pursuing claims for relief under the Federal Communications Act ("FCA"), 47 U.S.C. §§ 201 *et seq.*

## RULE 12(B)(6) STANDARDS

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Dismissal should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir.1997) (quoting *Conley v. Gibson,* 355 U.S. 41, 45– 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), or unless an issue of law is dispositive, *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993); *see Hospice of Metro Denver, Inc. v. Group Health Ins. of Oklahoma,* 944 F.2d 752, 753 (10th Cir.1991) ("Dismissal of a case pursuant to Fed. R.Civ.P. 12(b)(6) requires the legal determination that the plaintiff can prove no set of facts in support of his claim to entitle him to relief.") (citations omitted). The Tenth Circuit has observed that the federal rules " 'erect a powerful presumption against rejecting pleadings for failure to state a claim.' " *Maez v. Mountain States Tel. and Tel., Inc.*, 54 F.3d 1488, 1496 (10th Cir.1995) (quoting *Morgan v. City of Rawlins,* 792 F.2d 975, 978 (10th Cir. 1986)).

A court judges the sufficiency of the complaint accepting as true all well-plead-

ed facts, as distinguished from conclusory allegations, *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304 (10th Cir.1998), and drawing all reasonable inferences from those facts in favor of the plaintiff. *Witt v. Roadway Express*, 136 F.3d 1424, 1428 (10th Cir.), *cert. denied*, 525 U.S. 881, 119 S.Ct. 188, 142 L.Ed.2d 154 (1998); *see Southern Disposal, Inc. v. Texas Waste Management*, 161 F.3d 1259, 1262 (10th Cir.1998) (court "need not accept ... conclusory allegations as true."). It is not the court's function "to weigh potential evidence that the parties might present at trial." *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir.1991). The court construes the allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir.1991).

These deferential rules, however, do not allow the court to assume that a plaintiff "can prove facts that it has not alleged or that the defendants have violated the ... laws in ways that have not been alleged." *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (footnote omitted). Dismissal is a harsh remedy to be used cautiously so as to promote the liberal rules of pleading while protecting the interests of justice. *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1359 (10th Cir.1989).

**COMPLAINT**

In October of 1999, SWB announced a new service, VPOP–DAS, that it claimed would significantly reduce the costs for ISP to transport internet and network traffic generated by end-users and would make it easier and more affordable for ISPs to offer customers local internet access in markets of all sizes, including customers in rural areas by eliminating the need for ISPs to make large capital investments and the need for end-users to pay additional charges for access. In a news release, SWB represented that "ISPs and enterprise customers are able to expand their geographic reach while still maintaining a single location" and "End-users receive a local, toll-free number to access their ISPs and corporate networks LATA-wide."[1] (Dk. 1, ¶ 9).

At a sales presentation in November of 1999, SWB representatives pitched VPOP–DAS and made the specific representations that VPOP–DAS would be available on a LATA-wide basis in late February of 2000 for Area Code 785 and in March of 2000 for Area Code 316 and that orders for additional ports would be filled within one to two weeks. In reliance upon various representations, the plaintiffs executed the VPOP–DAS agreements with SWB in December of 1999. MSI entered into a five-year contract for two LATA-wide ports in the 316 area, and WWW executed a three-year agreement for two LATA-wide ports in the 785 area and two LATA-wide ports in the 316 area.

After executing these agreements, the plaintiffs began marketing these services "targeting end-users in smaller communities and rural areas." (Dk. 1, ¶ 13). Initial customer response to this marketing was so favorable that both plaintiffs ordered additional port groups. In early February of 2000, a SWB representative told the plaintiffs that technical difficulties with network management had delayed the implementation of VPOP–DAS. Several weeks later, the same representative said

---

1. In a footnote to this allegation, the plaintiff explains that "LATA is an acronym for 'Local Access and Transport Area'" and may sometimes be called a service area or local toll calling area. Each LATA is designated by or corresponds to a three-digital Area Code such as 785 or 316. (Dk. 1, ¶ 9, n. 2).

that VPOP–DAS had been implemented on a limited basis in the 785 area but that it had not been implemented in the 316 area. The representative also said that full implementation in both areas would not probably occur until May or June of 2000. In late March of 2000, another SWB representative contacted MSI saying that the prior contract had been lost or misplaced and that another need to be executed.

On or about May 15, 2000, SWB told the plaintiffs that VPOP–DAS's implementation in Kansas would be phased in over several years and that LATA-wide access in the 785 and 316 areas would not be available prior to full implementation. SWB representatives later explained "that SWB decided to implement VPOP–DAS on an incremental basis because SWB would be required to make certain costly system improvements before the service could be made available in small communities and rural areas on a LATA-wide basis." (Dk. 1, ¶ 19).

In early March of 2001, SWB or SBC–ASI told the plaintiffs that VPOP–DAS would be available LATA-wide within the 785 and 316 areas effective March 16, 2001. The defendants did not provide the additional port groups ordered in early 2000. The defendants notified other ISPs of the accelerated implementation of VPOP–DAS approximately one month before telling the plaintiffs.

### Breach of Contract

Alleging they entered into contracts to acquire VPOP–DAS on a LATA-wide basis within the 316 and 785 areas, the plaintiffs claim the defendants breached the contracts and implied covenants of good faith and fair dealing by: (1) failing and refusing to provide them with VPOP–DAS on a LATA-wide basis; (2) failing to provide them with additional port groups despite timely orders; (3) billing them for unnecessary services without lawful justification and threatening to cut off service for non-

payment; and (4) cutting off service to them at various times without lawful justification.

### Fraud or Misrepresentation

Count two simply alleges that "SWB made false representations of existing and material fact ('misrepresentations')" without setting forth the specific statements alleged to be misrepresentations. (Dk. 1, ¶ 31). The complaint in earlier paragraphs set forth various representations made by SWB representatives including the specific representation "that VPOP–DAS would be available on a LATA-wide basis in late February of 2000 for Area Code 785 and some time in March of 2000 for Area Code 316, and that orders for additional ports would be filled within one to two weeks." (Dk. 1, ¶ 11(b)). At ¶ 12, the plaintiffs allege that in reliance on these representations they executed the VPOP–DAS agreements with SWB in December of 1999. The complaint also alleges SWB representatives continued to represent after the agreements were executed that VPOP–DAS on a LATA-wide basis was delayed but was being implemented and would be available in May or June of 2000 and that SWB would not bill for certain services until full implementation occurred.

### Fraud Through Silence

Count three simply alleges that "SWB had knowledge of material facts that MSI and WWW did not have and that MSI and WWW could not have discovered by the exercise of reasonable diligence" without setting forth the specific material facts allegedly undisclosed. (Dk. 1, ¶¶ 40–41). Earlier in the complaint at ¶ 11(c), the plaintiffs allege:

At all times pertinent, SWB possessed superior knowledge than either MSI or WWW regarding: (i) the composition, status, capabilities and limitations of SWB's telecommunications system and related facilities; (ii) the technical re-

quirements for SWB to implement VPOP–DAS on a LATA-wide basis within the 785 and 316 Areas in Kansas; and (iii) the status of SWB's internal business plans and decisions relating to the implementation of VPOP–DAS on a LATA-wide basis within the 785 and 316 Areas in Kansas. Consequently, at least until or about the middle of May 2000, MSI and WWW reasonably believed that SWB's representations regarding the LATA-wide implementation of VPOP–DAS in Kansas were true. (Dk. 1, ¶ 11(c)).

## FILED RATE DOCTRINE

The defendants contend the plaintiffs' claims are subject to the filed rate doctrine, as the VPOP–DAS services were the subject of SWB Tariff No. 73, at § 37 when SWB provided such services and were subject to contract terms identical to the tariff when SBC–ASI provided such services. The defendants argue the doctrine precludes the plaintiffs from pursuing their state law claims.

The plaintiffs take the position that the filed rate doctrine has no application here. They argue their state law claims do not seek to change or challenge the rates, services or terms of the filed tariff and are consistent with the filed tariff. In the absence of a conflict or inconsistency with their state law claims and the tariff, the plaintiffs say their claims are preserved by 47 U.S.C. § 414 and ask the court to wait until discovery has been completed to decide whether the plaintiff's state law claims are based on duties distinguishable from those created under the FCA. The plaintiffs also contend this case is distinguishable from precedent because SWB cancelled its VPOP–DAS tariff effective March 21, 2000, without ever providing the services on a LATA-wide basis and prior to the contractual assignment to SBC–ASI. Without a federal tariff, the plaintiffs argue that state law governs SBC–ASI's ob-

ligations to them and that the filed rate doctrine does not control their claims against SBC–ASI just because the former tariff is incorporated into the agreement. Finally, the plaintiff MSI points out that its second agreement was not executed until after the SWB cancelled its tariff.

▉ Under the Federal Communications Act of 1934 ("FCA"), rates charged by common carriers, like the defendants, are regulated by the Federal Communications Commission ("FCC"). Common carriers are required to file a tariff with the FCC listing a schedule of charges, 47 U.S.C. § 203(a), and are precluded from charging or collecting different rates, from extending privileges or from employing classifications or practices which would affect listed charges unless outlined in the schedule, 47 U.S.C. § 203(c). "These provisions are modeled after similar provisions of the Interstate Commerce Act ("ICA") and share its goal of preventing unreasonable and discriminatory charges." *AT & T Corp. v. Central Office Telephone, Inc.,* 524 U.S. 214, 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (citation omitted). Thus, the Court has applied the ICA's "filed rate doctrine" to tariff provisions under the FCA. *Id.* This doctrine holds that " 'the rate of the carrier duly filed is the only lawful charge,' " that " '[d]eviation from it is not permitted upon any pretext,' " and that " '[s]hippers and travelers [customers] are charged with notice of it.' " *Central Office,* 524 U.S. at 222, 118 S.Ct. 1956 (quoting *Louisville & Nashville R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915)). Once approved, a tariff " 'binds both carriers and shippers [customers] with the force of law.' " *Brown v. MCI WorldCom Network Services, Inc.,* 277 F.3d 1166, 1170 (9th Cir.2002) (quoting *Lowden v. Simonds–Shields–Lonsdale Grain Co.,* 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939)). " 'The rights as

defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.'" *Central Office,* 524 U.S. at 227, 118 S.Ct. 1956 (quoting *Keogh v. Chicago & Northwestern R. Co.,* 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922)).

Upon allegations that a carrier violated the tariff, a customer may file a complaint with the FCC or in any United States District Court of competent jurisdiction. 47 U.S.C. § 207. Such suits are limited by "the filed-rate doctrine (also called the filed-tariff doctrine) [which] 'bars all claims-state and federal-that attempt to challenge the terms of a tariff that a federal agency has reviewed and filed.'" *Brown,* 277 F.3d at 1170 (quoting *Evanns v. AT&T Corp.,* 229 F.3d 837, 840 (9th Cir.2000)). "As a corollary, no one may bring a judicial proceeding to enforce any rate other than the rate established by the filed tariff." *Brown,* 277 F.3d at 1170. "In addition to barring suits challenging filed rates and suits seeking to enforce rates that differ from the filed rates, the filed-rate doctrine also bars suits challeng-

ing services, billing or other practices when such challenges, if successful, would have the effect of changing the filed tariff." *Id.* (citing *Central Office,* 524 U.S. at 223, 118 S.Ct. 1956).[2]

The filed-rate doctrine " 'does not serve as a shield' staving off claims against a carrier based on the tariff itself." *Brown,* 277 F.3d at 1171 (quoting *Lovejoy v. AT&T Corp.,* 92 Cal.Ap92 Cal.App.4th 1016Fp.4th 85, 100, 92 Cal.App.4th 1016F, 111 Cal.Rptr.2d 711 (2001)) (quoting *Central Office,* 524 U.S. at 230–31, 118 S.Ct. 1956 (Rehnquist, C.J., concurring)). In *Brown,* the customer brought a claim under federal law alleging that MCI had violated the tariff by setting up extraneous accounts at each of the customer's office locations in order to assess unauthorized $10 fees. The Ninth Circuit held:

> While it is true that Brown's complaint must be resolved with reference to the tariff, that does not mean the district court may not hear the suit. The filed-rate doctrine precludes courts from deciding whether a tariff is reasonable,

**2.** In *Central Office,* the customer relied on an AT & T salesperson's representations in contracting for services even though the contract said it was governed by the filed tariff. Upon learning that the AT & T's service and billing were not as represented, the customer sued for breach of contract and tort. The customer tried to avoid the filed-rate doctrine by arguing its suit did not implicate rates but only sought to enforce contracts for services and billing. The Supreme Court rejected this effort: "[r]ates, ..., do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa." 524 U.S. at 223, 118 S.Ct. 1956. Though the customer's chosen billing option was not specifically included in the tariff, the Court barred the customer's claim for it:

> [T]he additional services and guarantees that respondent claims it was entitled to by virtue of ... petitioner's [AT & T's] representations and ... sales brochures—viz.,

faster provisioning, the allocation of charges through multilocation billing, and various matters relating to deposits, calling cards, and service support, ...—all pertain to subjects that are *specifically addressed* by the filed tariff.

> ... For example, whereas respondent asks to enforce a guarantee that orders would be provisioned within 30 to 90 days, the tariff leaves it up to petitioner to "establis[h] and confir[m]" a due date for provisioning, requires that petitioner merely make "every reasonable effort" to meet that due date, and if it fails gives the customer no recourse except to "cancel the order without penalty or payment of nonrecurring charges." (citation omitted). Faster, guaranteed provisioning of orders for the same rate is certainly a privilege within the meaning of 47 U.S.C. § 203(c) and the filed rate doctrine. (citation omitted).

*Central Office,* 524 U.S. at 224–25, 118 S.Ct. 1956.

reserving the evaluation of tariffs to the FCC, but it does not preclude courts from interpreting the provisions of a tariff and enforcing that tariff. If the filed-rate doctrine were to bar a court from interpreting and enforcing the provisions of a tariff, that doctrine would render meaningless the provisions of the FCA allowing plaintiffs redress in federal court. *See* 47 U.S.C. §§ 206–07. Brown seeks merely to enforce the tariff. He does not claim that he was promised something outside the tariff and then denied it, as in *Central Office.* *See* 524 U.S. at 222–23, 118 S.Ct. 1956. Nor does he claim that MCI had some obligation to him beyond the obligations set out in the tariff. *See Evanns,* 229 F.3d at 841 (holding plaintiff's claim that carrier was required to disclose pass-through of Universal Service Fee (USF) to customers was barred by filed-rate doctrine where the USF assessment was included in the tariff). Nor does he argue that the $10 fee, if authorized by the tariff, is unreasonable. *See Cahn-mann,* 133 F.3d at 489–90 (holding claim that carrier's modification to tariff after customers had signed up for service was unreasonable was barred by the filed-rate doctrine). Rather, Brown claims that there is no authorization in the tariff to charge him the $10 fee, and that the fee therefore violated the tariff. *See Lovejoy,* 92 Cal.App.4th at 101, 92 Cal. App.4th 1016F, 111 Cal.Rptr.2d 711(holding claim that carrier switched customer's long-distance service without his knowledge or consent was not barred by the filed rate doctrine). We therefore conclude that Brown's claim is not precluded by the filed-rate doctrine.

*Brown,* 277 F.3d at 1171–72. Thus, the filed-rate doctrine does not bar a plaintiff's claim to enforce a tariff. *Lipton v. MCI Worldcom, Inc.,* 135 F.Supp.2d 182, 188–89 (D.D.C.2001) ("[T]he plaintiff here is not suing under state law to enforce an agree-ment outside the tariff. Nor is she seeking to alter the terms and conditions provided for in the tariff or to enforce an agreement to provide services on terms 'different from those listed in the tariff.' ").

The availability of state law remedies is a subject addressed in the FCA at 47 U.S.C. § 414, which provides: "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." Courts have interpreted this provision and others narrowly to preserve the "policy of confining telecommunications common carriers to tariffed services and vesting the FCC with primary jurisdiction to determine the validity of tariffs." *Cahnmann v. Sprint Corp.,* 133 F.3d 484, 488 (7th Cir.1998). Thus, "[a] tariff filed with a federal agency is the equivalent of a federal regulation, . . . , and so a suit to enforce it, and even more clearly a suit to invalidate it as unreasonable under federal law (both types of suit being comprehended in the plaintiff's contract count), arise under federal law." *Id.* For this reason, courts do not recognize a state law breach of contract claim to enforce a tariff:

> And since the federal regulation defines the entire contractual relation between the parties, there is no contractual undertaking left over that state law might enforce. Federal law does not merely create a right; it occupies the whole field, displacing state law.

*Cahnmann v. Sprint Corp.,* 133 F.3d at 489 (citations omitted). "Courts have held that the savings clause preserves state law remedies for breaches of duties that are distinguishable from duties under the act." *Spielholz v. Superior Court,* 86 Cal. App.4th 1366, 1374, 104 Cal.Rptr.2d 197, 203–04 (Cal.App. 2 Dist.2001) (citations omitted); *see, e.g., Cooperative Communications, Inc. v. AT & T Corp.,* 867 F.Supp. 1511, 1516 (D.Utah 1994).

Neither side has devoted much research or argument to what significance, if any, should be attached to SWB's cancellation of its VPOP–DAS tariff effective March 22, 2001. This may be explained by the fact that the plaintiffs' complaint does not make any specific mention of the tariff or of its cancellation.[3] The defendants summarily contend that the tariffs "in effect at the time of the representations and agreements control" and cite *Trodent Development Corp. v. MCI Worldcom Communications, Inc.*, 2002 WL 531358 (N.D.Ill. Apr. 9, 2002). In *Trodent*, the plaintiffs executed a two-year contract for long distance services that included certain line and usage credits which were not authorized by the defendant's tariff. Several days later, the plaintiff executed a second contract at the defendant's request and upon the defendant's misrepresentation that the second contract was identical to the first. The defendant's tariffs were canceled during the second year of this contract, and the plaintiff claimed entitlement to the credits for the second year. The district court held:

> In the instant case, the alleged misrepresentations regarding the rates were made in November and December of 1999. The contract was signed in December of 1999. The tariffs were still in effect when the representations regarding the rates were made, and the timing of the service provided is irrelevant.
>
> ... Because the representations in the instant case were made in 1999, while the tariffs governing the rates charged to plaintiff were in effect, those representations concerned tariffed services. Because federal law therefore preempts plaintiff's contract claims, its motion to remand is denied.

2002 WL 531358 at *2. According to *Trodent*, representations and agreements are subject to any tariffs existing when the representations and agreements are made.

Another case differs somewhat in its approach to this issue. The contracts in *Frontline Comm. v. Sprint Comm.*, 178 F.Supp.2d 432, 434 (S.D.N.Y.2002), had been executed when the tariffs were in effect but were later withdrawn. Sprint attempted to assert the filed rate doctrine which the district court rejected on this basis:

> However, Sprint's contention that the filed tariff doctrine bars plaintiffs' claims after withdrawal of Sprint's tariffs is not persuasive. The filed tariff doctrine does not exist in isolation from the regulatory scheme it was intended to further. After August 1, 2001, when Sprint's tariffs were withdrawn, the tariffs ceased to have the force of federal law, and became simply documents referred to in the CSA [Custom Service Agreement], subject to the common law rules of contract interpretation.

178 F.Supp.2d at 438.

The court is convinced that the present motion to dismiss, however, is not the

---

**3.** The complaint does not even refer to a tariff. For purposes of their motion to dismiss, the defendants rely on the fact that the tariffs are mentioned in the contracts attached to the plaintiffs' complaint. As to the particular tariff and its terms in effect between December of 1999 and March of 2000, the plaintiffs argue they have been unable to locate the specific tariff provision that addresses service provisioning intervals. Consequently, the state of the record regarding the tariff, its terms and its effectiveness is such that the court is uncomfortable in making a final ruling that would depend on the tariff and its terms in question. Nonetheless, the parties should understand that based on what has been represented as the tariff and assuming it governs the parties' representations and agreement, the plaintiffs' claims of an agreement for LATA-wide service by a particular date appear to be an effort to enforce an agreement that concerns matters otherwise addressed by the tariff but that involve terms which are outside the tariff.

proper vehicle for deciding the effect of the cancellation on the filed rate doctrine's applicability to the plaintiff's different state law claims. The parties devote little attention to this issue and to its significance in this case. For example, the timing of the various alleged representations on which the state law claims are being brought is critical to the court's determination, but those facts have not been alleged with specificity in the complaint nor argued with any more specificity in the parties' briefs. For that matter, the plaintiffs' fraud claims have not been pleaded with sufficient specificity for the court to determine when all such substantive representations were made and those claims ostensibly arose.[4] Moreover, as previously mentioned, the applicable tariff and all of its particular terms were not alleged or specifically referenced in the complaint, which puts the court on some questionable grounds in deciding this issue on the pleadings.

■ To assist any eventual litigation of these state-law claims, the court will take this opportunity to reveal its initial impression on some of the issues raised under the filed rate doctrine but not decided herein due to the insufficient record in this 12(b)(6) proceeding. First, the case law is clear that the plaintiffs may not bring a state law breach of contract claim simply to enforce the terms of a federal tariff. Second, the provisions found in the filed

tariffs submitted as exhibits to the parties' memoranda specifically address VPOP–DAS and describe the rights and liabilities of the parties with respect to those services and accompanying rates. The plaintiffs face a difficult burden in showing that the tariffs includes terms that guarantee the availability of VPOP–DAS on a LATA-wide basis on a date certain or on any of the dates so alleged in the complaint or that makes SWB liable for damages to the extent alleged in the complaint.[5] If the plaintiffs were to prevail on their state-law claims, the result would be discriminatory privileges for the plaintiffs in the form of a guaranteed date for LATA-wide access and of compensatory damages to which other customers subject to SWB's tariff would not be entitled. *See ICOM Holding, Inc. v. MCI Worldcom, Inc.,* 238 F.3d 219, 222 (2nd Cir.2001). Such privileges are not found in the tariff, and to bestow them on the plaintiffs would contradict the tariff. *Id.* It appears that the same could be said for the plaintiffs' claims that they were billed for unnecessary services without lawful justification, were threatened with having services cut off for nonpayment, and were cut off service at various times without lawful justification.

**PRIMARY JURISDICTION**

The defendants contend the issues in this case are outside the conventional experience of judges and within the adminis-

---

**4.** The plaintiffs' fraud claims plainly lack the specificity required by Rule 9(b) and the case law interpreting it.

**5.** The filed tariff, specifically § 37 of SWB's Tariff F.C.C. No. 73, does not guarantee that SWB would provide VPOP–DAS service on the dates alleged in the plaintiffs' complaint. Nor does it provide that the SWB's service of VPOP–DAS would be accessible on a LATA-wide basis by a particular date. The plaintiffs point to various provisions within the tariff on pricing which show that SWB obviously contemplated that it eventually would provide

this service so as to be accessible on a LATA-wide basis. Section 37 expressly provides that the SWB's provision of this service was "subject to the availability and operational limitations of the Telephone Company's equipment and associated facilities." Thus, SWB was afforded the discretion to make these services available within the "operational limitations" of its equipment and facilities. As alleged in the plaintiffs' complaint, SWB's representatives told them the delay in providing LATA-wide service to more remote areas was necessary to make additional system improvements which were costly. (Dk. 1, ¶ 19).

trative discretion of agencies charged with and skilled in regulating such matters. The defendants characterize the issues here as "including the interpretation of the applicable tariffs and statutes, the reasonableness of defendants' business practices regarding their billing and provisioning as well as defendants' obligations to plaintiffs." (Dk. 8, p. 19). The defendants maintain a key factual issue will be "the reasonableness" in implementing the new VPOP–DAS service and the "complex issues of the reasonableness of defendants' practices in implementing a new technology are properly subject to FCC expertise and regulation." *Id.* at 20. The defendants also point to the specific allegation in the complaint concerning the FCC's role with regards to SWB's assignment of the VPOP–DAS agreements to SBC–ASI.

The plaintiffs contend the defendant's argument is foreclosed by 42 U.S.C. § 207 which authorizes, in part, a private cause of action in federal district court when a person sustains damages for which a common carrier is liable under the FCA. Having chosen this remedy expressly provided by statute, the plaintiffs say they are now barred from pursuing any complaint before the FCC.[6] The plaintiffs summarily contend that the federal issues implicated here are narrow and do not require any specialized expertise or involve matters uniquely suited to an agency's exercise of discretion.

The plaintiffs seek leave to add a federal law claim under the FCA alleging: (1) that the defendants failed to provide VPOP–DAS service on a LATA-wide basis despite repeated reasonable requests for such service in violation of 47 U.S.C. § 201(a); (2)

that the defendants' conduct and practices "in connection with such VPOP–DAS communication service have been and continue to be unjust or unreasonable in violation of" 42 U.S.C. § 201(b); and (3) that the defendants' failure and refusal to provide VPOP–DAS service on a LATA-wide basis "may be designed or intended to give an undue or unreasonable preference or advantage to Prodigy [the defendants' preferred ISP provider] and/or to subject ... [the plaintiffs] to undue or unreasonable prejudice or disadvantage in the rural and small community markets for dial-up Internet access service" in violation of 47 U.S.C. § 202(a). The defendants oppose the motion to amend arguing the proposed amendment would be futile in that the same deficient state-law claims are included and that the new federal law claim is subject to the doctrine of primary jurisdiction. The plaintiffs filed no reply to the defendants' contention that the primary jurisdiction doctrine would apply to their federal law claims.

■ Primary jurisdiction is "a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter v. Cooper,* 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (footnote and citations omitted). The purposes of this doctrine are to: (1) ensure desirable uniformity in determinations of certain administrative questions, and (2) promote resort to agency experience and expertise where the

---

**6.** The plaintiffs mistakenly argue that their filing in federal court precludes the FCC from entertaining their administrative complaint that would be filed after this court referred the matter to the FCC and stayed the federal case pending an agency decision. The plain-

tiffs cite a line of decisions which have held that a party is barred from pursuing a judicial proceeding after it has commenced an agency action. The plaintiffs fail to explain how these decisions carry any weight or authority in applying the primary jurisdiction doctrine.

court is presented with a question outside its conventional experience. *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). Courts are to invoke this doctrine when these purposes are served. *Id.; see Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491, 1496 (10th Cir.1996). Of course, "[c]ourts should not be too hasty in referring a matter to an agency, to develop a 'dependence' on the agencies whenever a controversy remotely involves some issue falling arguably within the domain of the agency's expertise." *MCI Telecommunications Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1104 (3rd Cir. 1995) (quotation and citation omitted).

■ "Primary jurisdiction is invoked in situations where the courts have jurisdiction over the claim from the very outset but it is likely that the case will require resolution of issues which, under a regulatory scheme, have been placed in the hands of an administrative body." *Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1376 (10th Cir.1989). When the doctrine is invoked, "the judicial process is suspended pending referral of the issues to the administrative body for its views." *Id.* at 1377. Factors relevant in deciding whether to apply the doctrine include: (1) are the issues of fact "within the conventional experience of judges;" (2) do the "issues of fact require the exercise of administrative discretion, or require uniformity and consistency in the regulation of the business entrusted to a particular agency." *Marshall*, 874 F.2d at 1377 (citing *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 96 L.Ed. 576 (1952)). The Tenth Circuit recognizes the relevance of additional considerations:

We have said that a district court in its discretion should invoke primary jurisdiction and defer only if the benefits of obtaining the agency's aid outweigh the need to resolve the litigation expeditiously. The district court may consider many factors in striking this balance, including: how agency action will aid the litigation; whether the litigation involves conduct requiring continuing supervision by the agency; whether the issues to be litigated are unique to regulated industries; and whether proceedings already are pending before the agency.

*Mical Communications v. Sprint Telemedia*, 1 F.3d 1031, 1038 (10th Cir.1993) (quoting *Gulf States Utils. Co. v. Alabama Power Co.*, 824 F.2d 1465, 1473 (5th Cir. 1987) (citation omitted)).

■ The defendants present the more compelling arguments for this court declining to decide the issues and deferring to the expertise and experience of the FCC. When the plaintiffs recast their state law claims as federal law claims, it became even more apparent that this case involves numerous issues requiring an expertise in interpreting tariffs; in determining the impact of tariffs following withdrawal; in interpreting and applying the tariff clause that makes the defendant's provision of services "[s]ubject to the availability of equipment and facilities;" in evaluating the reasonableness of the defendants' efforts in implementing a new service in light of such technical considerations as cost and technology; in determining the duties of the SWB–ASI as the assignee under the agreements along with the obligation to comply with conditions imposed by the FCC in approving SWB's merger with Ameritech; in assessing the reasonableness of the defendants' business practices in billing and providing services; and in determining whether the defendants' practices and efforts are unjust, unreasonable or discriminatory.

The critical factual issue in this case will be the reasonableness of the defendants' efforts in implementing and providing a

new service. "Courts have consistently found that claims which allege unreasonable practices in violation of § 201(b) fall within the primary jurisdiction of the FCC." *Oh v. AT&T Corp.*, 76 F.Supp.2d 551, 557 (D.N.J.1999) (citations omitted). The legal standards involved in this issue of reasonableness will turn largely on the interpretation of the defendants' obligations under the tariffs and the determination of those obligations following the withdrawal of those tariffs. The court believes there is a significant concern for uniformity in answering these administrative questions. Indeed, a decision on this issue would amount to policy decisions regarding the implementation of this new service and the adequacy of the tariffs. *See Brown v. MCI WorldCom Network Services, Inc.*, 277 F.3d at 1172. The factual determinations involved in this issue of reasonableness will require considerable expertise and knowledge of the telecommunications industry, of its different services, and of the various considerations in implementing such different services. It is outside the conventional experience of this court to evaluate the relevance and weight of all such considerations, particularly those of a policy or technical nature, that are arguably involved in a telecommunication company's efforts to implement a new service. "[C]ourts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency." *National Comm. Ass'n v. American Tele. and Tele.*, 46 F.3d 220, 223 (2nd Cir.1995) (citation omitted). The court believes the resolution of the legal and factual issues implicated by the plaintiffs' federal law claims requires the FCC's policy expertise and specialized knowledge and falls within the regulatory scheme accorded the FCC.

If the plaintiffs wish to pursue this action, they are directed to initiate an appropriate proceeding at the FCC on or before July 15, 2003, to consider the issues raised in the pleadings of this case and the parties are to update the court periodically on the progress of the FCC proceedings and report to the court promptly upon the conclusion of same. As for the state-law claims, the court has not dismissed them. The application of the filed rate doctrine to these claims and the alleged legal obligations underlying the breach of contract claim will depend in part on the resolution of the referred federal claims. Because of this relationship between the claims, it is appropriate to stay further proceedings on the state-law claims until the FCC has decided the referred claims or until further order of the court.

IT IS THEREFORE ORDERED that the plaintiffs' motion for leave to file amended complaint (Dk. 21) is granted;

IT IS FURTHER ORDERED that the defendants' motion to dismiss (Dk. 7) is granted insofar as the court refers the plaintiffs' federal-law claims to the FCC and stays all further proceedings on the state-law claims until the FCC has decided the referred claims or until further order of the court.

IT IS FURTHER ORDERED that the parties shall each submit status reports to the court by letter concerning the action before the FCC. The first status report will be due on or before September 15, 2003, with subsequent reports due on three-month intervals and upon a final decision by the FCC.